**CARNEY BATES & PULLIAM, PLLC**
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorneys for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SAMUEL VICKERY, individually, and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**ALBERT CORPORATION, and ALBERT CASH, LLC,**<br><br>**Defendants.** | CASE NO.:<br><br>**CLASS ACTION COMPLAINT** |

1

Plaintiff Samuel Vickery, a Petty Officer in the U.S. Navy ("PO Vickery"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against Albert Corporation and Albert Cash, LLC (collectively, "Albert" or "Defendant") and alleges as follows:

## I.   NATURE OF THE ACTION

1.     This Complaint seeks to protect active-duty military servicemembers from Albert's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA").

2.     The MLA was enacted to protect United States active-duty servicemembers and their dependents (collectively, "Covered Borrowers"[1]) from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Albert makes no effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide mandatory legal protections for them.

3.     Albert has for years been in the business of payday lending through so-called earned wage access ("EWA") products—it makes funds available to its customers, who repay Albert principal and finance charges (including expedite fees) on or just after payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck.

---

[1] "Covered borrower means a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a covered member… or a dependent … of a covered member." 32 C.F.R. § 232.3.

4.    Albert markets to consumers it considers financially vulnerable or financially coping, including those whose spending exceeds their income, who have minimal savings, and who overdraft their bank accounts frequently.

5.    During the relevant period, Albert took in triple-digit finance charges on its payday advances—with APRs on some of its loans to Plaintiff as high as **347%**. The end result is a financial product that extracts exorbitant fees from servicemembers and their families, encourages serial usage and dependence on the costly loans, worsens borrowers' financial circumstances, and traps them in a cycle of debt.

6.    Until December 2024, Albert offered payday advances through a purported "overdraft" mechanism. That is, Albert created pseudo bank accounts for borrowers (which were only used in connection with cash advances) that borrowers could "overdraw" and have overdrawn proceeds deposited in their normal account, in exchange for a promise to repay Albert the "overdraft" and bring the account back to $0. The overdraft mechanism was fiction and, in reality, a subterfuge to avoid being regulated as a credit product. The substance of Albert's "Instant overdraft" product bears more similarity to typical credit arrangements than the informal "bounce protection" features that the Regulation Z overdraft exemption was designed to cover. This action challenges only Albert's overdraft advance practices from the period before December 2024.[2]

7.    Plaintiff used Albert's payday advance product while on active duty in the U.S. Navy. By virtue of the sky-high fees charged for borrowing against his anticipated earnings, Albert extended consumer credit to Plaintiff in violation of the MLA. Albert did not make an effort to fulfill its duty to determine whether it was

---

[2] Albert discontinued its "overdraft" enabled payday advance product in December 2024 and began offering "non-recourse" cash advances. Relevant here, Albert previously entered into a settlement to resolve claims that its non-recourse cash advance program violated the MLA.

3

lending to Covered Borrowers or to provide the mandatory legal protections required by the MLA.

8.      Borrowing money that is repaid on payday is not an innovation; it is a quintessential extension of consumer credit. As so-called EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, these products trap borrowers in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's payday advance transactions are extensions of consumer credit.

9.      In violation of the MLA, Defendant used its cash advance product to saddle Covered Borrowers with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

10.      Albert's consumer credit agreements violated the MLA in at least three ways: By (1) charging interest above the 36% statutory Military Annual Percentage Rate (MAPR) cap; (2) failing to provide required MLA Disclosures; and (3) requiring access to the borrowers' deposit account as security for the loan. 10 U.S.C. § 987(b), (c) & (e)(5).

11.      Among the central animating purposes of the MLA was to curb predatory payday loans made to servicemembers.[3] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[4] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective

---

[3] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[4] *Id.* at 10–16.

states."[5] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[6]

12. Albert's business practices violated the MLA and were part of a systematic nationwide policy and practice. PO Vickery seeks to hold Defendant accountable for its rampant MLA violations perpetrated through its cash advance program during the relevant period.

## II.   PARTIES

13. PO Vickery is an individual over 18 years of age. At all times relevant, PO Vickery was a natural person and resident of Tierrasanta, California. He has been an active-duty member of the United States Navy since 2023. During the class period, PO Vickery was a Covered Borrower and an active-duty servicemember employed by the United States Navy.

14. Defendant Albert Cash, LLC is a Delaware LLC with its principal place of business at 440 North Barranca Avenue, #3801, Covina, CA 91723.

15. Defendant Albert Corporation is a Delaware corporation with its principal place of business at 440 N. Barranca Avenue, #3801, Covina, California 91723.

16. Defendant Albert Cash, LLC, is an affiliate of Albert Corporation. Upon information and belief, at all relevant times, Albert Cash, LLC, and Albert Corporation acted as one entity. This complaint therefore refers to Albert Cash, LLC, and Albert Corporation collectively as "Albert."

17. Albert transacts or has transacted business in this County and throughout the United States. Through its digital-technology platform, including its

---

[5] *Id.* at 10–11.
[6] *Id.* at 11.

website and mobile app, Albert has offered, brokered, and extended digital payday advances, engaged in the servicing and collections of such advances, and provided other financial products and services to consumers, as described below.

18.    Albert has offered loan agreements to consumers, including Covered Members, since at least 2021, entering into millions of credit transactions.

### III.    JURISDICTION AND VENUE

19.    This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in Covina, California.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Additionally, Defendant's terms of service at all times provided for exclusive jurisdiction and venue of any dispute relating to Albert's product in the state and federal courts located in the Central District of California. Jurisdiction and venue are therefore proper in this Court.

### IV.    LEGAL BACKGROUND

**a.    The MLA Was Specifically Designed to Curb Predatory Short-Term Loans to Covered Members**

21.    The DoD's Report on lending practices discussed the payday lending industry at length.[7] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[8]

22.    Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[9]

---

[7] Report, *supra* n.2.
[8] *Id.* at 10–11.
[9] *Id.* at 11.

6

Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[10]

23. While app-based payday advance products are a somewhat recent development, the genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[11] Those loans, like Albert's, "are delivered and collected online through electronic fund transfer."[12]

24. The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Albert's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These

---

[10] *Id.* at 14. To be sure, companies like Albert do not collect physical checks from their customers at loan initiation, but instead take a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

[11] *Id.* at 15.

[12] *Id.* at 16.

borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[13]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[14]

25.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a servicemember with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[15] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[16]

---

[13] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrower to consider loan payments as being their top priority." *Id.* at 44.

[14] *Id.* at 21–22.

[15] *Id.* at 39.

[16] *Id.* at 41–42.

26.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[17]

27.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on servicemembers and endangering the nation's military readiness.[18]

28.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming servicemembers. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

29.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

**b.    The Military Lending Act**

30.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

31.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

---

[17] *Id.* at 46.

[18] The DoD requested legislation protecting servicemembers "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

32. The MLA also requires mandatory disclosures in "consumer credit"[19] transactions with Covered Members, which include:

    a. A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

    b. Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

    c. A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

33. Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

34. The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

### V.    FACTS

**a.    The "Earned Wage" Product Market and Albert**

    **i.    So-called EWA products charge high fees and wreak havoc on borrowers' financial health**

35. A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

36. Recently, an old product with new packaging—coined "earned wage

---

[19] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

37.    EWA products provide workers, before their payday, with funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the borrower's bank account.

38.    Albert is one such fintech company that provided a payday advance service, which it called "Instant overdraft." The Instant overdraft service is a cash advance whereby Albert loans customers funds that are repaid on their next payday.

39.    Contrary to Albert's marketing, Albert's "Instant Overdraft" product was not a genuine overdraft service.

40.    An "overdraft" occurs when a person does not have enough money in their bank account when they: (1) write a check; (2) withdraw money from an ATM; (3) use a debit card to make a purchase; or (4) make an automatic payment.[20] This is consistent with the ordinary understanding of overdraft protection – an accommodation offered to customers who inadvertently spend more than their account balance while conducting everyday transactions.

41.    Albert's cash advance product is fundamentally different from overdraft services:

    a.    Albert's product is not connected to a regular checking account used for everyday transactions. Rather, Albert created pseudo bank accounts that existed solely to facilitate cash advances and are not used for paying bills, writing checks, or making debit card purchases.

    b.    Financial institutions do not charge "express fees" or solicit "tips" in connection with overdraft services. Overdrafts are either paid or not

---

[20] *See* The American Bankers Association.

11

paid – instantly; there is no possibility of delivering funds on a faster or slower schedule in exchange for additional fees.

c. Albert advertised its "overdraft" product to consumers as advances and "instant" cash access, touting the ability to advance cash through the "overdraft" framework, not as a deposit account with overdraft protection. Albert's marketing materials emphasize the speed and availability of borrowed funds.

42. On its website, under the title "Banking," Albert promised borrowers could "Overdraft up to $250":

# Banking

Get paid early. Overdraft up to $250. Cash back on gas, groceries, and delivery.

Terms apply.

Learn more

*Figure 1*[21]

43. To access Instant overdrafts, users were required to link their bank account to their Albert profile and authorize Albert to collect repayment through automated debits from their connected debit card on the scheduled repayment date (*i.e.*, payday).

44. In addition to Instant overdrafts, Albert has extended short-term "non-recourse" cash advances to borrowers, which it called "Albert Instant."

45. Albert has been paid through two types of fees on its cash advances: (1) expedite fees, and (2) mandatory subscription fees.

---

[21]  http://web.archive.org/web/20240613073017/https://albert.com/  (last visited June 1, 2026).

46. First, **expedite fees** (alternatively known as "express fees") are charged to provide instant access to borrowed funds. To receive cash instantly, Defendant charged $4.99 per advance in late 2023 and $6.99 per advance during 2024. The speed of access to funds is an essential and defining aspect of app-based payday advance products like Albert's that are designed to address – and marketed as addressing – what is generally a less than two-week liquidity problem. Consumers who cannot wait days to access their funds must pay whatever fees a provider charges to obtain their money as quickly as possible.

47. The actual cost to provide borrowers with instant access to funds is less than $0.05.[22]

48. Albert's website, app, and marketing included numerous representations about the speed of access to funds, starting with the name: "*Instant* overdraft" and "Albert *Instant.*" Elsewhere, Albert emphasized it made "funds available practically instantly (as in a few minutes or less)!"[23] The same video highlighted that borrowers could "[g]et up to $250 in 2 minutes."[24]

49. The speed of access to funds is an essential and defining aspect of app-based payday advance products. They are designed to address—and marketed as addressing—what is generally a less-than-two-week liquidity problem.

50. While express fees are notionally optional and users could receive a cash advance from Albert without paying one, fee-free advances are difficult to access and negate the usefulness of the product to consumers. For instance, the free,

[22] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

[23] *Albert Instant Review – Get up to $250 in a few minutes, but the price has just changed A LOT*, YouTube, at 2:00, https://www.youtube.com/watch?v=J9pyPhFQxTo (Nov. 6, 2023) (showing screenshot from Albert website).

[24] *Id.* at 1:09.

non-expedited versions of Instant overdraft and Albert Instant took between one and three *business* days to receive, while the expedited service takes just a few minutes. This delay is problematic for Albert's intended users, consumers living paycheck to paycheck who turn to app-based payday advance providers for the precise reason that their need for cash is urgent and cannot wait. The express fees are inextricably intertwined with obtaining a cash advance because it is a borrower's effort to obtain a cash advance that triggers Albert's solicitation of the fee, and the design of Albert's product makes it difficult for users to obtain an advance without paying the fee.

51.    Indeed, a recent study found that the average term for advance products provided across several different providers in the "EWA" industry was only 10 days.[25] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees a provider charges to obtain their funds as quickly as possible. As a result, the vast majority of users pay expedite fees to obtain immediate funds disbursement.[26]

52.    Turning to the second type of fee, **subscription charges** are monthly fees Albert charged its users to be eligible to apply for Albert Instant overdraft loans.

53.    Albert forced users signing up to its service through its app to agree to a $14.99 monthly subscription to gain access to the Instant overdraft product.

---

[25] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").

[26] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

54. Albert did not allow users to obtain an Instant overdraft loan without first enrolling in the automatically recurring charge.

55. Albert provided no mechanism through the Albert app to sign up for Instant overdrafts without first agreeing to monthly subscription charges.

56. When properly viewing EWA products' expedite fees and subscription charges as costs of credit (*i.e.*, finance charges), the annual percentage rates (APR) for these loans are eye-popping.

57. A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

Wage-based cash advances that don't request tips
331%

Wage-based cash advances that request tips
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

*Figure 2*

58. The APR received by Albert for its Instant cash advance product is similar, with Albert making cash advances to Plaintiff exceeding **346%** APR (without even including the expensive subscription fees). *See infra*.

59. These sky-high APRs are the direct result of Albert's fee structure combined with the short duration of its loans – a combination that is the hallmark of predatory payday lending.

60. Ironically, Albert and other EWA providers market their products as low-cost alternatives to payday loans. In truth, Albert is a wolf in sheep's clothing:

extending loans with APRs even more expensive than the exorbitantly-priced payday loans it claims to replace.

61. On top of charging loan-shark interest rates, Albert and others limited the amount a borrower can access, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees. Albert limited the amount of funds available through an advance to an amount between $25 and $250 but allowed users to take out additional advances up to their limit during each repayment period.

62. This architecture maximizes fees for Albert, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[27]

63. The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

64. A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing

---

[27] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

16

within two weeks.[28] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

65. Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[29]

### ii. Albert Utilized Strict Underwriting Procedures and, Consequently, Almost Always Collected

66. While so-called EWA products are financially disastrous for consumers, they have proven profitable for the companies selling them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

67. During the relevant period, Albert acknowledged on its website that "[n]ot all Genius customers will qualify for Instant overdraft" or Albert Instant advances.

68. To qualify for Albert Instant overdraft or Albert Instant, borrowers were required to first (1) access the Albert app, (2) create an account, (3) link their primary bank account to the Albert app, (4) be employed, and (5) receive regular payments through salary or another benefits provider.

69. To determine whether a borrower is creditworthy, and decide how much credit to extend, Albert required users to connect their checking accounts to Albert through Plaid. Plaid is a financial services provider that partners with Albert and

---

[28] Wang, Constantine, Burks, Farahi, *A Loan Shark In Your Pocket*, CENTER FOR RESPONSIBLE LENDING at 7 (Oct. 2024).

[29] Constantine, Bamona, Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING at 6 (Oct. 2024).

other fintech companies to allow them to view customer banking information. Plaid allowed Albert to "[q]uickly verify assets and income" of borrowers, providing "real-time visibility into applicants' income streams, past and forecasted earnings, and employment."[30]

70. Albert used its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans on payday. In short, through Plaid, Albert obtained constantly updating visibility of all transactions in connected accounts to monitor borrowers' financial condition.

71. Through its access to, and perpetual review of, borrowers' financial accounts, Albert continually assessed the creditworthiness of its borrowers, and the attendant risk of offering them credit. In determining whether, and how much, credit to extend its borrower customers, Albert considered account activity, transaction history, the amount and frequency of deposits, and prior usage of Instant overdraft.

72. Albert's underwriting process was both rigorous and continual. Albert continually reviewed borrowers' accounts to determine their eligibility for Instant overdraft and Albert Instant and limits on how much they could borrow, which was continually adjusted.

73. Albert strictly monitored its borrowers' financial health to determine how much credit the borrowers can take on and reliably repay. Albert determined how much credit to offer its borrowers based on their prior cash advance usage and the activity of the accounts linked to Albert. Through its constant underwriting process, Albert advanced cash to borrowers only when it was confident they would repay.

74. For borrowers that qualified, Albert generally began by offering relatively low amounts of cash, like $25 or $50. As of June 2024, Albert's website

---

[30] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited June 1, 2026).

stated "Overdraft limits range from $25 to $250" and the "average approved overdraft limit is approximately $95 as of 6/7/24."[31]

75.    Borrowers obtained greater access to credit—*i.e.*, Albert would raise their advance limit—by consistently paying off prior advances to Albert on time and otherwise improving the health of their linked accounts, by, *e.g.*, earning more money and maintaining a higher balance.

76.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[32] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like Albert directly review borrowers' financial accounts—is one without a difference.

77.    In addition to these rigorous loan qualification procedures, Albert required its borrowers to pre-authorize Albert to debit their chosen payment method

---

[31] http://web.archive.org/web/20240613073017/https://albert.com/ (last visited June 1, 2026).

[32] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

on the scheduled repayment date. In marketing materials Albert provided to affiliate marketers during the relevant period, Albert explained repayment as follows:

- **Albert will generally set your repayment to automatically occur on the date of your next paycheck, though you can change this date to be earlier or later.** If you're unable to repay your Albert Instant overdraft, you won't be able to borrow any additional money until your advance is repaid in full.

*Figure 3*[33]

78.    When a user would request an Instant overdraft or Albert Instant advance, the Albert app automatically scheduled the repayment for the borrower's next payday.

79.    The Albert app did not include a mechanism to cancel an Instant overdraft repayment once an advance has been issued.

80.    Upon information and belief, the Albert app did not allow a user to delete or remove the linked debit card from their account (which users must authorize Albert to debit for loan repayments and subscriptions when they create an account) once they subscribed and/or took out a loan. Accordingly, Albert deprived users of a mechanism through the app for cancelling an advance repayment.

81.    Borrowers were also required to be current on all their prior Instant overdrafts and Albert Instant advances in order to be eligible for an advance.

82.    In sum, Albert's underwriting process requires, before any money changes hands, that borrowers: (1) sign up for an account with Albert; (2) demonstrate they receive qualifying direct deposits from an employer, payroll provider, or benefits provider; (3) link the bank account to which regular deposits are made to Albert through Plaid; (4) authorize Albert to automatically debit the linked accounts in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (5) be current on all previous Instant

---

[33] *Albert Instant Review*, *supra* note 22, at 2:00.

20

overdrafts. Borrowers who failed to fulfill each of these requirements could not obtain cash advances.

83.    Through these underwriting procedures and policies, Albert ensured it would be able to automatically deduct the sum of the payday advance amount, plus any additional charges, from the linked account on payday.

84.    These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[34]

### b.    Albert's Loans to Plaintiff

85.    PO Vickery was during the relevant period an active duty servicemember in the U.S. Navy.

86.    Albert extended consumer credit to Plaintiff in the form of Instant overdrafts and/or Albert Instant advances like those discussed above.

87.    Plaintiff used the payday advances from Albert for personal, family, or household purposes.

88.    Plaintiff paid Albert's finance charges, in the form of express fees, to obtain Instant overdraft and/or Albert Instant extensions of credit.

89.    An exemplar cash advance made by Albert to Plaintiff is shown in the below table, with the cost of credit and APR included:

*Table 1 (Exemplar Albert cash advance made to PO Vickery)*

| Loan Period | Principal Amount | Express Fees | APR |
|---|---|---|---|
| 8/22/24–8/29/24 (7 days) | $75.00 | $4.99 | 364.9% |

---

[34] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

21

90.    Plaintiff has received multiple usurious loans from Albert since he began using Albert's cash advance services.

91.    The express fees charged with his loans are immediately and directly connected to Albert's extensions of credit to Plaintiff.

92.    Further, Albert's credit agreement required Plaintiff to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

93.    Albert's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c).

94.    In connection with its Albert cash advance transactions, Albert also uses a check or other method of access (*i.e.*, pre-authorized account debit) to a deposit, savings, or other financial account maintained by the borrower as security for the obligation.

## VI.    CLASS ALLEGATIONS

95.    Plaintiff brings this class action on behalf of himself and all others similarly situated and the general public. The proposed Class is defined as follows:

> **MLA Class**: All Covered Members who entered into an agreement with Albert to use a cash advance product (including Albert Instant and Instant overdraft) before December 1, 2024, in which Albert charged an express fee.

96.    Expressly excluded from the Class is: (a) any Judge presiding over this action and members of their families; (b) Albert and any entity in which Albert has a controlling interest, or which has a controlling interest in Albert, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

97.    Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

**<u>Numerosity and Ascertainability</u>**

98.    Plaintiff is unable to state the precise number of members of the Class because such information is in the exclusive control of Albert. Albert's scheme has harmed and continues to harm the members of the Class. The members of the proposed Class are so numerous that joinder of all members is impracticable. Albert has made millions of loans, and Plaintiff estimates there are, at least thousands of consumers in the Class. As a result, members of the Class are so numerous that joinder of all class members is impracticable. The exact size of the proposed class, and the identity of the members thereof, will be readily ascertainable from the business records of Albert.

99.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Albert's possession, custody, or control.

**<u>Commonality</u>**

100.   There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Albert has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a.   Whether Plaintiff and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

b.   Whether Albert is a "creditor" subject to the protections and limitations of the MLA;

c.   Whether Albert's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA;

d. Whether Albert entered into standard form loan agreements with Covered Members;

e. Whether Albert's loans exceed the MLA statutory rate cap of 36% MAPR;

f. Whether Albert failed to provide required cost-of-credit disclosures in violation of the MLA;

g. Whether Albert's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

h. Whether Albert's standard form loan agreements contain an arbitration clause in violation of the MLA;

i. Whether each month that Plaintiff and the Class members paid money to Albert it restarted the statute of limitations under the MLA;

j. Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

k. Whether Albert should be enjoined from continuing its lending practices in the manner challenged herein; and

l. Whether Albert is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiff and the Class are entitled under 10 U.S.C. § 987(f)(5).

**Typicality**

101. The claims and defenses of Plaintiff are typical of the claims and defenses of the Class because Plaintiff is a Covered Member and his loan agreements with Albert are typical of the type of personal, household, or family loans that Albert normally provides to Covered Members. Additionally, Albert uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature.

**Adequate Representation**

102.  Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class, and Plaintiff has no conflict of interest that will interfere with maintenance of this class action.

103.  Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

**Predominance and Superiority**

104.  The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Class.

105.  A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons, which is superior to alternative methods involving individual litigation:

a.  The Class is so numerous as to make joinder impracticable. However, the Class is not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

b.  Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members

25

not parties to such adjudications, or substantially impair their ability to protect their interests; and

   c.  The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

106. Albert has acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief under the Federal Rules of Civil Procedure appropriate with respect to the Class. A declaration should be made that Albert's loans to Covered Members are void from inception.

107. The proposed Class fulfills the certification criteria of Federal Rule of Civil Procedure 23.

## COUNT I

## VIOLATIONS OF MILITARY LENDING ACT

108. Plaintiff re-alleges and incorporates by reference herein the allegations set forth in paragraphs 1-106 above.

109. Plaintiff brings this claim on behalf of himself and the MLA Class.

110. The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

111. A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

112. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in

26

any plan or arrangement for consumer credit." 32 C.F.R. § 232.4. The MAPR therefore includes the express fees and subscription charges imposed by Albert.

113. Plaintiff and the Class members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

114. Plaintiff is a "Covered Member" with respect to the Albert consumer credit agreements because Plaintiff is and was an active-duty service member who was obligated by law to repay advances he took out for personal, family or household purposes.

115. Albert is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

116. The underlying advance transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

117. Albert charged Plaintiff and the Class well above the 36% interest rate cap on their loans, in violation of the MLA.

118. Albert fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

27

119. Albert's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

120. Albert's standard form loan agreements include class action waivers and jury trial waivers in violation of 10 U.S.C. § 987(e)(2).

121. Albert's standard form loan agreements also use a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation.

122. As a result, Albert violates 10 U.S.C. § 987.

123. Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A).

124. Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for the relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter an Order:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against Albert and in favor of Plaintiff and the Class on all counts;

c. That the Court find and declare that Plaintiff and Class members' standard form loan agreements violate the MLA;

d. That the Court find and declare that Albert violated the MLA and award Plaintiff and Class members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

28

e. That the Court award Plaintiff and Class members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. An order awarding the members of the Class actual, statutory, and all other damages available by law, with pre- and post-judgment interest;

g. That Albert be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that Albert be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

h. That the Court award interest as allowable by law;

i. That the Court award reasonable attorneys' fees as provided by applicable law;

j. That the Court award all costs of suit; and

k. That the Court award such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: June 15, 2026                    Respectfully submitted,

                                        /s/ Joseph Henry (Hank Bates, III
                                        Joseph Henry (Hank) Bates, III
                                        State Bar No. 167688
                                        CARNEY BATES & PULLIAM, PLLC
                                        One Allied Drive, Suite 1400
                                        Little Rock, AR, 72202
                                        Telephone: (501) 312-8500
                                        Email: hbates@cbplaw.com

                                        *Attorneys for Plaintiff Samuel Vickery and the Proposed Class*

29